UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| Plaintiff, | : | CRIMINAL ACTION NO. |
| | : | 08-cr-004 (JCH) |
| v. | : | |
| | : | |
| TORRANCE MCCOWN | : | |
| Defendant. | : | MARCH 25, 2009 |
| | : | |

**RULING RE: DEFENDANT TORRANCE MCCOWN'S MOTION FOR JUDGMENT OF ACQUITTAL AND IN THE ALTERNATIVE A NEW TRIAL (DOC. NO. 843)**

**I.    INTRODUCTION**

On February 9, 2009, a jury found defendant Torrance McCown guilty of Count Two of a Superceding Indictment, which count charged him with conspiracy to possess with intent to distribute, and to distribute, fifty grams or more of cocaine base, in violation of Title 21, United States Code, sections 841(a)(1) and 841(b)(1)(A)(iii). McCown is incarcerated and awaiting sentencing.  He now moves the court for judgment of acquittal pursuant to Fed. R. Crim. P. 29(c) and for a new trial pursuant to Fed. R. Crim. P. 33.  For the following reasons, the court denies McCown's Motion (Doc. No. 843).

**II.    FACTS**

The Superceding Indictment charged McCown and sixteen others with various offenses.  McCown was charged with conspiring with nine other individuals to possess with intent to distribute fifty grams or more of cocaine base ("crack").  McCown, who was tried alone, was convicted by a jury of this charge.

1

At trial, the government presented evidence regarding the conspiracy led by Roshaun Hoggard to distribute cocaine in New Haven, Connecticut. The evidence adduced at trial concerning the Hoggard conspiracy, and Torrance McCown's role therein, consisted of, <u>inter alia</u>: (1) testimony from Special Agent Uri Shafir that he spoke with McCown after his arrest, compared his voice to the suspected voice of McCown on intercepted telephone calls, and found it to be a match; (2) testimony from Special Agent Raymond Walczyk that he spoke with McCown for approximately three hours, compared his voice to the suspected voice of McCown on intercepted telephone calls, and found it to be a match; (3) the testimony of cooperating witness Kenneth Thames that Thames purchased crack cocaine from Hoggard on various occasions between September and November 2007; (4) intercepted telephone calls between Hoggard and Thames communicating in a code[1] which, Thames explained, indicated various quantities of crack cocaine; (5) testimony of Officer Brian Pazsak that he conducted surveillance of Hoggard and Thames, and that he saw Hoggard and Thames exchange an item that a reasonable jury could infer was crack cocaine; (6) intercepted telephone calls between Hoggard and an individual identified by Special Agent Shafir as McCown; (7) testimony of Special Agent Anastas Ndrenika, testimony of Special Agent Angelo Meletis, and intercepted telephone calls between Hoggard and a source of supply in New York City, from which a reasonable jury could infer that on the evening of November 27, 2007, Hoggard traveled to New York City to obtain powder cocaine

---

[1] Thames testified that, when making orders for drugs, he and Hoggard often used code words to indicate drug quantities. Pursuant to this code, a "Monday" meant one-eighth of one ounce of crack cocaine, also known as an "eight-ball," "Tuesday" meant two eight-balls, "Wednesday" meant three eight-balls, and "Fortune" meant four eight-balls. The government offered multiple intercepted calls between Hoggard and Thames in which they used these codes.

from his source of supply, identified by the government as Genero Marte; (8) the testimony of Officer Daniel Sacco that police seized approximately 272 grams of powder cocaine from Chris Lamont Sherman in the early morning hours of November 28, 2007, and the testimony of Officer Kaitlin Flavin, together with intercepted calls around the time of that seizure, from which a reasonable jury could conclude that Hoggard was in a vehicle with Sherman just prior to Sherman's arrest, and that Sherman had gone to New York City with Hoggard to obtain the powder cocaine that was seized; (9) testimony of Special Agent John Rubinstein that he saw an individual in a red Toyota Solara exit his vehicle and interact with an unidentified individual on the street, following which that unidentified individual engaged with other individuals on the street in a manner from which a reasonable jury could infer that the unidentified individual was engaged in hand-to-hand narcotics transactions; (10) testimony of Special Agent Raymond Walczyk that he had seen McCown operating the red Toyota Solara observed by Special Agent Rubinstein; (11) intercepted telephone conversations, allegedly between Hoggard and McCown, from which a reasonable jury could conclude that McCown had been the individual driving the red Toyota Solara; (12) testimony of Officer Michael Paleski that cocaine, along with a pot and kitchen utensils with cocaine residue on them, were found in a safe in a residence where, the testimony asserted, Hoggard lived; (13) testimony of Special Agent Shafir that following his arrest, McCown acknowledged purchasing, each week, up to seven "light" eight-balls (weighing 2.5 to 2.7 grams each) of crack cocaine from Hoggard for resale for a period of ten months, that Hoggard provided him with the drugs on credit, that Hoggard obtained

cocaine in powder form in New York City and then transported it to New Haven for conversion and distribution, and that McCown resold the drugs in "dime bag" quantities to a network of customers in Newhallville.

On February 6, 2009, at the close of the government's case, the court made a finding ("the Bourjaily finding") that the government had proven, by a preponderance of the evidence, that McCown was a member of the charged conspiracy. See Bourjaily v. United States, 483 U.S. 171 (1987); United States v. Geaney, 417 F.2d 1116 (2d Cir. 1969). Following this ruling, McCown moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The court denied McCown's Motion, stating that:

> The jury has before it not only the now admitted tapes, the telephone conversations, they have identification on those tapes of Mr. McCown's voice. Perhaps most importantly it has Mr. McCown's statement. The jury may not credit the Special Agent. But if the jury does credit the Special Agent's testimony about what Mr. McCown said, he, in effect, admitted to being involved with drug dealing with Roshaun Hoggard. As the government counsel points out, what he said is in effect corroborated either on the telephone calls or by actual I think surveillance. For example, of the New York purchase of the powder cocaine.

Trial Transcript ("Tr.") at 431. The jury returned a verdict of guilty against McCown. McCown now moves this court, pursuant to Rule 29(c), for a judgment of acquittal. He also moves this court to set aside the verdict and grant a new trial pursuant to Rule 33(a).

## II.   STANDARD OF REVIEW

### A.   Motion for Judgment of Acquittal

Rule 29(a) of the Federal Rules of Criminal Procedure provides that district courts "must enter a judgment of acquittal of any offense for which the evidence is

insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).  Rules 29(b) and (c) permit a court to reserve the decision on the motion until after the jury returns a verdict.  "A defendant challenging the sufficiency of the evidence that was the basis of his conviction at trial bears a 'heavy burden.'"  United States v. Hawkins, 547 F.3d 66, 70 (2d Cir. 2008) (quoting United States v. Parkes, 497 F.3d 220, 225 (2d Cir. 2007)).  In deciding whether to grant a motion pursuant to Rule 29, the court should "view the evidence in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility."  Hawkins, 547 F.3d at 70.  A jury verdict shall be sustained "so long as any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. (quoting Parkes, 497 F.3d at 225-6) (internal quotation marks omitted).  "[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt."  United States v. Glenn, 312 F.3d 58, 70 (2d Cir. 2002) (internal quotation marks omitted).

     B.     Motion for a New Trial

McCown seeks that a new trial be ordered pursuant to Fed. R. Crim. P. 33.  Rule 33(a) allows a district court to vacate "any judgment and grant a new trial if the interest of justice so requires."  The Rule gives the trial court "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice."  United States v. Ferguson, 246 F.3d 129, 133 (2d Cir. 2001) (internal citation omitted).  The district court, when examining the entire case, must make an objective evaluation of the

evidence and determine whether "'competent, satisfactory and sufficient evidence' in the trial record" supports the jury's verdict. Id. Unlike in a Rule 29 motion, where the court must draw every inference in favor of the government, in a Rule 33 motion the court is entitled to "weigh the evidence and in doing so evaluate for itself the credibility of the witnesses." United States v. Robinson, 430 F.3d 537, 543 (2d Cir. 2005) (quoting United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992)). However, it may not "wholly usurp the jury's role." Id. Although a trial court has substantially more discretion to grant a new trial under Rule 33 than it does to grant a motion for acquittal under Rule 29, the authority should be exercised "sparingly" and only in "the most extraordinary circumstances." Sanchez, 969 F.2d at 1414. "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." Ferguson, 246 F.3d at 133. A manifest injustice is found where the court has "a real concern that an innocent person may have been convicted." Parkes, 497 F.3d at 232.

### III.    DISCUSSION

####    A.    Timeliness

The government argues that McCown's Motion is untimely. Rule 33 provides that motions for a new trial, other than those based upon newly discovered evidence, "must be filed within 7 days after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(2). Rule 29 similarly provides that, "A defendant may move for a judgment of acquittal, or renew such a motion, within 7 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c)(1). Pursuant to Rule 45, the court may grant an extension of time to file motions under Rule 29 and Rule 33. Fed. R. Crim. P. 45(b)(1) ("When an act must or may be done within a specified period,

the court on its own may extend the time, or for good cause may do so on a party's motion made: (A) before the originally prescribed or previously extended time expires . . . .); see also Advisory Committee Notes to 2005 Amendments to Rule 45 ("Assuming that the current provisions in Rules 29, 33, and 34 were intended to promote finality, there is nothing to prevent the court from granting the defendant a significant extension of time . . . . The defendant . . . may consistently with Rule 45, seek an extension of time to file the underlying motion as long as the defendant does so within the seven-day period."). The verdict was returned on February 9, 2009, and McCown moved for an extension of time on February 10, 2009 (Doc. No. 809). The court granted an extension of time until March 11, 2009. See Order (Doc. No. 812). Because McCown moved within the seven-day period for an extension of time within which to file motions pursuant to Rule 29 and Rule 33, and filed his Motions on March 10, 2009, within the extended time period, his Motions were timely filed.

      B.      Motion for Judgment of Acquittal

The court finds that the evidence presented at trial was sufficient for a reasonable jury to conclude that McCown was guilty of conspiracy to possess with intent to distribute, and to distribute, fifty grams or more of cocaine base.

McCown acknowledges the testimony in the record that he admitted selling crack cocaine for Hoggard for a period of six or seven months. McCown also acknowledges the existence of intercepted tape recordings from which the jury could conclude that McCown was delivering drugs for Hoggard. McCown disputes, however, that the conversations confirm his inculpatory statement, contending that the conversations "could be construed to show nothing more than Mr. McCown had a menial low-level job

of distributing drugs for Mr. Hoggard on deals which Mr. Hoggard himself had consummated." Mot. at 3. Because the conversations do not confirm the statement, McCown contends, and a defendant's post-arrest statement must be corroborated to serve as the basis of a conviction, his conviction should be overturned. He also disputes that the evidence establishes that the drug involved in the conspiracy was crack as opposed to powder cocaine or some other drug.

As McCown concedes, Special Agent Shafir testified that McCown admitted committing the crime with which he was charged. Specifically, McCown acknowledged purchasing up to 15-19 grams of crack cocaine each week for a period of ten months, purchasing those drugs for the purpose of reselling them, repackaging them into "dime bag" quantities, and selling them to a network of customers. He acknowledged that Hoggard provided him the drugs on credit, and that he knew that Hoggard obtained cocaine in powder form in New York City and then transported it to New Haven for conversion and distribution.

"It is a long-settled principle that 'an accused may not be convicted on his own uncorroborated confession.'" United States v. Bryce, 208 F.3d 346, 354 (2d Cir. 1999) (quoting Smith v. United States, 348 U.S. 147, 152 (1954)). The modern incarnation of this Rule, which also applies to admissions, provides that to serve as the basis of a conviction, there must be "substantial independent evidence which would tend to establish the trustworthiness of the statement." Id. (quoting Opper v. United States, 348 U.S. 84, 93 (1954)). The Second Circuit has further explained that,

> [D]eclarations of a defendant made in the course of the acts charged as an offense can be divided into two categories—those that bear insufficient indicia of reliability as proof of the defendant's commission of the offense to support a

8

> finding of guilt beyond a reasonable doubt, and those that, considering the nature and the context of the defendant's words, demonstrate his commission of the offense so reliably that, without need of other supporting evidence, they can support a finding of guilt beyond a reasonable doubt. Statements in the latter category may be considered self-corroborating. When the prosecution seeks to support a finding of guilt for a possessory offense on the defendant's statements alone, unless they fall into the second category, corroborative evidence is required. If, on the other hand, the defendant's statements, given their nature and context, can support a finding of guilt beyond a reasonable doubt, no further evidence is required.

Bryce, 208 F.3d at 355.  While it appears to the court that the statement likely falls into the self-corroboration category, the court will treat it as requiring corroboration, because in its judgment the statement was adequately corroborated.

McCown does not dispute that the evidence showed that Hoggard ran a conspiracy to distribute narcotics, but disputes that the intercepted telephone calls of McCown and Hoggard evidenced distribution of crack cocaine as opposed to some other drug.[2]  The evidence at trial was, however, more than sufficient for a jury to conclude beyond a reasonable doubt that Hoggard ran a conspiracy to distribute crack cocaine in New Haven, Connecticut during the time period charged in the indictment. From testimony of cooperating witness Thames, testimony regarding surveillance conducted of Thames and Hoggard, and intercepted telephone calls, the jury could infer that Thames purchased from Hoggard, and resold in smaller quantities, crack cocaine between September and November 2007.  Although quantities like "eight balls" and

---

[2]At trial, McCown denied that he had participated in the intercepted telephone conversations as alleged by the government.  In his Motion, he appears to accept, at least for purposes of the Motion, that his voice was the voice on the recordings.  See Mot. at 3-4 ("The heart of the government's case, however, was tape recorded conversations between Mr. Hoggard and Mr. McCown.").  Because McCown, in his Motion, challenges the content of the conversations and what they demonstrate, and not the antecedent question of whether he participated in the conversations, and because at trial the government adduced sufficient evidence for the jury to identify his voice on the intercepted conversations, the court will assume in ruling on McCown's Motion, without detailed discussion, that his voice was adequately identified on the recordings.

"dime bags" could be applicable to powder cocaine, Thames testified to the fact that Hoggard and he were in fact distributing crack cocaine, not powder cocaine. From testimony of Special Agent Ndrenika, Special Agent Meletis, and intercepted telephone calls, the jury could infer that Hoggard obtained powder cocaine from a source of supply in New York City and transported it to New Haven. From the testimony of Officer Paleski regarding the search of 397 Edgewood Avenue, other testimony asserting that 397 Edgewood was Hoggard's residence, and intercepted telephone calls involving Hoggard, the jury could infer that Hoggard "cooked" powder cocaine into crack cocaine at his residence. Thus, a reasonable jury, if it credited the evidence in the record, could have concluded that Hoggard was obtaining powder cocaine, converting it to crack cocaine, and then distributing it in New Haven through intermediaries. Though the aforementioned testimony did not confirm McCown's involvement in the conspiracy, it did corroborate several aspects of McCown's statement—that Hoggard obtained powder cocaine in New York City to convert into crack, and that Hoggard distributed crack in "eight ball" quantities that associates converted to dime bags for resale on the street.

With regard to McCown's involvement in the conspiracy, McCown contends that the intercepted telephone calls do not confirm McCown's post-arrest statement's characterization of his role in the conspiracy, but instead demonstrate only that McCown "had a menial low-level job of distributing drugs for Mr. Hoggard on deals which Mr. Hoggard himself had consummated." Mot. at 3. As a result, McCown

10

argues, the intercepted telephone calls do not corroborate his post-arrest admissions.[3]

The court disagrees.  First, the intercepted telephone calls and post-arrest admissions were not the sole evidence of McCown's participation in the conspiracy. Special Agent Raymond Walczyk testified that he had seen McCown operating a red Toyota Solara. Special Agent John Rubinstein testified that he saw an individual in the same red Toyota Solara exit his vehicle and interact with an unidentified individual on the street, following which that unidentified individual engaged in what could be construed to be hand-to-hand narcotics transactions.  These interactions took place contemporaneously with intercepted telephone calls between Hoggard and McCown, in which Hoggard instructed McCown where to go.  When viewed in the light most favorable to the government and in conjunction with other evidence in the case, a reasonable jury could conclude that Rubinstein observed McCown provide an unidentified individual with crack cocaine, previously obtained from Hoggard, that the unidentified individual then redistributed to others.

Second, comparing the intercepted telephone conversations to the post-arrest admission, the court disagrees that the calls do not corroborate his admission.  The government presented approximately 30 telephone calls between Hoggard and an

---

[3] It is unclear whether McCown also contends that evidence that he was a low-level distributor, without more, would be insufficient to convict him of conspiracy to distribute.  The Second Circuit has carved out an exception to conspiracy liability for certain transferees, known as the buyer-seller exception. See United States v. Parker, 554 F.3d 230, 234-35 (2d Cir. 2009) (quoting United States v. Gore, 154 F.3d 34, 40 (2d Cir. 1998)).  However, this exception does not protect those engaged in procuring drugs in wholesale quantities and redistributing them to end-users, even if such a person's role in the conspiracy is relatively minor.  See id.  Individuals who play a minor role may still be convicted of conspiracy; discrepancies in role are typically addressed through application of the Sentencing Guidelines, which provide for taking the relative severity of the individual defendant's role into account.  See U.S.S.G. §§ 3B1.1 & 3B1.2.  Even assuming that McCown's characterization of what the intercepted calls show accurately reflects his role in the conspiracy, evidence of being a "menial low-level" drug distributor for Hoggard would be sufficient evidence from which a reasonable jury could find that McCown was a knowing and intentional participant in the Hoggard conspiracy.

individual claimed to be McCown from which a reasonable jury could conclude that McCown was distributing drugs he had obtained from Hoggard. McCown's post-arrest admission elaborated more precisely the time-frame during which McCown engaged in dealings with Hoggard, the quantities McCown purchased from Hoggard, and that Hoggard "fronted" the drugs to McCown. McCown's admission spoke in general terms of obtaining drugs from Hoggard and repackaging them for sale to customers; the admission did not describe the means by which customers were obtained or the exact role of McCown and Hoggard in communicating with customers. It is therefore consistent with the fact that Hoggard provided McCown the drugs on credit that Hoggard, the leader of the organization, would have closely supervised McCown's sales and indeed "dispatched" McCown to consummate sales that Hoggard had himself arranged. Therefore, the admission is in no way contradicted by evidence from the tape recordings, as characterized by McCown, that McCown delivered drugs on behalf of Hoggard in situations where Hoggard was communicating directly with the ultimate recipient of the drugs. Furthermore, as discussed earlier, a reasonable jury could conclude from the evidence in the record that the conspiracy involved distribution of crack cocaine, rather than some other drug. Therefore, the government presented evidence from which a reasonable jury could infer that the government had proven beyond a reasonable doubt all the necessary elements of the crime: (1) the existence of a conspiracy to possess with intent to distribute or to distribute cocaine base; (2) McCown knew of the existence of the conspiracy; (3) McCown intentionally joined the conspiracy; (4) it was either known or reasonably foreseeable to McCown that the conspiracy involved 50 grams or more of cocaine base.

Separately, McCown argues that the court, in response to the jury's request that certain conversations be played back, put the court's imprimatur on the government's identification of McCown as a call participant. Before the jury entered, the court reviewed the note that the jury had sent:

> THE COURT: Just to discuss the fact we have a note and it's been marked as Court Exhibit 1 and came to us at 12:58. It says the jury would like to hear the recordings of all McCown calls played tabs then listed five tabs. It says I can't read whether it says any others or any others.

Trial Tr. at 541. Attorney Cramer then requested, outside the presence of the jury, that the court instruct the jury that "we're going to play the calls which the government claims contain the voice of Mr. McCown." Id. at 543. The interaction in the presence of the jury took place as follows:

> THE COURT: Everyone please be seated. Ladies and gentlemen, I have received now two notes from you. I will start with first note I received. I'll read it into the record. It's been marked as Court Exhibit 1 as I read it, it says the jury would like to hear the recordings of all of the McCown calls as they were played tabs number 99, number 25, 52, 113, 127, or any others. And then bears the signature which I can't read. If the foreperson could stand and identify himself by jury number.
> THE FOREPERSON: Juror number 10.
> THE COURT: Have I correctly read that first note?
> THE FOREPERSON: Yes.
> THE COURT: What we'll do, we'll play those calls now. The government is going to play them in the order they played them during trial and I believe that we agreed there are 34 calls.
> MR. HALL: Yes.
> THE COURT: So if the government, whenever the government is ready, you can begin with call number 89. I believe it is the first one. And I would like to remind the jury of a couple of things. These calls that we have selected are the ones as to which the government offered evidence and claims they involve Mr. McCown. Also I will remind you that you may use your notebooks as they are played. Please remember the evidence is the tape recording itself, not what's in the notebook.
> MR. CRAMER: We have some remarks I made before, your Honor.
> THE COURT: I should I just did that.
> MR. CRAMER: No.

13

> THE COURT: What we are going to play in response to your note are the tape recorded conversations which the government has claimed are Mr. McCown's calls. Whether they are or not is for you to decide that. But what we have selected are the calls that the government as I say has offered evidence they are but it is still up to you to decide if they are and those are the ones that we'll play now. All right, sir?
> MR. CRAMER: Yes.
> THE COURT: We're starting with 89. If you call off the number as you play them.
> (Playing the tape.)

Id. at 543-45. The court disagrees that it put the court's imprimatur on the government's identification of McCown as the individual on the calls. The court did not itself emphasize that it would play back the "Hoggard-McCown telephone conversations," as McCown contends. Mot. at 6. Rather, the court read back the text of the jury's note aloud to confirm its accuracy—the court's standard practice when it receives a note from the jury. The note itself referred to the calls as "the McCown calls," and accordingly the court recited that statement when reading the text of the note. The court did not repeat this terminology of its own accord—after reading the note, the court then said that it would "play those calls now," and immediately reminded the jury that, "[T]hese calls that we have selected are the ones as to which the government offered evidence and claims they involve Mr. McCown." Particularly in the light of the court's repeated instructions throughout the trial and in the charge delivered to the jury earlier that morning, both of which emphasized that it was the jury's task to determine who the call participants were, the court believed that this instruction was sufficient to respond to Attorney Cramer's earlier request that the court not put its imprimatur on the identity of the call participants. However, in response to Attorney Cramer's contemporaneous request for a further instruction, the court again emphasized at greater length that it was the jury's province to decide whether or not the

14

calls actually contained the voice of McCown. Both admonitions took place before any calls were played. Particularly in light of the further instruction immediately administered and the instructions given throughout the case, the court does not believe that its decision to read the jury's note as written, and to then refer to the calls as "the ones as to which the government offered evidence and claims they involve Mr. McCown," in any way put the court's imprimatur on the government witnesses' characterization of the call participants.

      C.      Motion for a New Trial

Although the court has more discretion to grant a Rule 33 motion, the court finds that there are no "extraordinary circumstances," Ferguson, 246 F.3d at 133, present in this case to warrant setting aside the jury's verdict and ordering a new trial. In examining the entire case, as it did in ruling on the Rule 29 motion, the court finds that there is sufficient evidence in the trial record to support the jury's verdict and that the jury's verdict did not result in a "manifest injustice." Therefore, the court denies McCown's Motion for a New Trial.

**IV.**    **CONCLUSION**

For the foregoing reasons, McCown's Motion for Judgment of Acquittal under Fed. R. Crim. P. 29(b), and Motion for a New Trial under Fed. R. Crim. P. 33(a) (Doc. No. 843), is **DENIED**.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 25th day of March, 2009.

                                        /s/ Janet C. Hall
                                        Janet C. Hall
                                        United States District Judge